IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Michael A. GRAL, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant,

v.

Michael A. GRAL,
Respondent.

Supreme Court

*No. 2006AP1021–D. Decided February 16, 2007.*

2007 WI 22

(Also reported in 727 N.W.2d 495.)

¶ 1. PER CURIAM. We review the recommendation of the referee, consistent with a stipulation entered into between the Office of Lawyer Regulation (OLR) and Attorney Michael Gral, pursuant to SCR 22.14(2),[1] that Attorney Gral's license to practice law in Wisconsin be suspended for a period of three years, effective February 27, 2006, which is the date this court summarily suspended Attorney Gral's license based on a federal criminal conviction for mail fraud.

¶ 2. We conclude that the referee's findings of fact are supported by satisfactory and convincing evidence. We further agree that the seriousness of Attorney Gral's

---

[1] SCR 22.14(2) states: Answer, no contest.

(2) The respondent may by answer plead no contest to allegations of misconduct in the complaint. The referee shall make a determination of misconduct in respect to each allegation to which no contest is pleaded and for which the referee finds an adequate factual basis in the record. In a subsequent disciplinary or reinstatement proceeding, it shall be conclusively presumed that the respondent engaged in the misconduct determined on the basis of a no contest plea.

professional misconduct warrants a three year suspension of his license to practice law in Wisconsin. In addition, we deem it appropriate that Attorney Gral pay the costs of this proceeding, which are $2228.10, as of August 28, 2006.

¶ 3.   Attorney Gral was admitted to practice law in Wisconsin in 1985. He has no prior disciplinary history. From August 1994 through July 2004 he practiced law at Michael Best & Friedrich, LLC (MBF). In October 2005 Attorney Gral voluntarily advised the State Bar of Wisconsin that he was changing his membership status from active to inactive.

¶ 4.   On December 14, 2005, the United States Attorney for the Eastern District of Wisconsin issued a one-count information against Attorney Gral, charging him with mail fraud, in violation of 18 U.S.C. § 1341 (2005). On that same date, Attorney Gral and the government filed a plea agreement in which Attorney Gral agreed to plead guilty to the one count information. Attorney Gral entered a plea the same day.

¶ 5.   On January 16, 2006, Attorney Gral advised the OLR that he agreed to a summary suspension of his law license pending the conclusion of disciplinary proceedings arising out of the federal mail fraud conviction. By order dated February 27, 2006, this court summarily suspended Attorney Gral's license.

¶ 6.   On April 26, 2006, the OLR issued a complaint against Attorney Gral charging a violation of SCR 20:8.4(b), which provides that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Attorney Gral filed an answer to the complaint.

¶ 7.   On June 15, 2006, the federal court sentenced Attorney Gral to two years imprisonment, to be fol-

lowed by three years of supervised release. The court also imposed a $50,000 fine to be paid within one year from Attorney Gral's release from prison. Attorney Gral paid the $50,000 fine on June 22, 2006.

¶ 8. In July 2006 the OLR and Attorney Gral entered into a stipulation by which Attorney Gral amended his answer to the OLR's complaint and entered a plea of "no contest" to the allegations in the complaint pursuant to SCR 22.14(2). The stipulation sets forth the background of the transactions that led to the federal mail fraud conviction. The stipulation notes that when the transactions occurred, Attorney Gral was an attorney at MBF. One of MBF's clients was Bielinski Bros. Builders, Inc. and related entities, which was owned by Frank and Harry Bielinski. Attorney Gral's principal contact at Bielinski Bros. was Robert Brownell, who served in various executive positions including serving as Bielinski's chief executive officer (CEO) for more than three years.

¶ 9. The stipulation states that Attorney Gral's guilty plea focused on two transactions, Harrison Lakes and Belize. Both transactions related to Georgetown Holdings, LLC, an entity in which Attorney Gral and Brownell were equal members, and entities in which Georgetown Holdings, LLC was the sole member.

¶ 10. The stipulation notes that on or about November 2001 Brownell and Attorney Gral formed Georgetown Holdings, LLC. At or about the same time they also formed Georgetown Ridgeview, LLC. Georgetown Holdings was the sole member of Georgetown Ridgeview, LLC. Georgetown Holdings and Georgetown Ridgeview were formed for the purpose of assisting the Bielinskis, who desired a like-kind exchange partner for the purchase and development of vacant land in Pewaukee for a new office building to be used as their

163

corporate headquarters. Ultimately Georgetown did not purchase and develop the Pewaukee land.

¶ 11. On or about January 9, 2004, FHB Investments, LLC acquired a subdivision in Lincoln County, Wisconsin, known as Harrison Lakes. FHB was a joint venture of Frank and Harry Bielinski and Brownell. FHB paid $1,561,000 for Harrison Lakes. Some months after the acquisition, Brownell asked Attorney Gral whether Georgetown would have an interest in acquiring Harrison Lakes from FHB. Brownell advised Attorney Gral that the Bielinskis were no longer interested in proceeding with the project. Attorney Gral states that Brownell told him that Georgetown could assist the Bielinskis and "do a favor for Frank and Harry" by purchasing Harrison Lakes. Brownell later led Attorney Gral to believe that the Bielinskis did not know of FHB's acquisition of Harrison Lakes and that the Bielinskis possibly considered the project still under contract.

¶ 12. On or about July 16, 2004, Georgetown Investments, LLC purchased Harrison Lakes from FHB. Georgetown paid FHB the purchase price of $1,561,000. Attorney Gral states that prior to the transfer of Harrison Lakes from FHB to Georgetown Investments, LLC, Attorney Gral was aware that the Bielinskis had not authorized the purchase of the property by Brownell. Despite this knowledge, Attorney Gral did not notify the Bielinskis of Brownell's conduct. Attorney Gral believed that Brownell, as one of the three members of FHB, had the legal and actual authority to act on behalf of FHB and to speak for the Bielinskis. Attorney Gral states that while his actions were inappropriate, they had the effect of preventing a loss to FHB since Georgetown's purchase of Harrison

164

Lakes from FHB in July 2004 was for the same price that FHB had paid for the property in January 2004.

¶ 13.    In the Belize transaction, Brownell executed a contract in July 2002 to purchase a condominium unit located in Florida for $2,760,000. Between September 2002 and June 2003, Brownell provided three down payments toward the purchase price that totaled $828,000. The first two down payments, totaling $552,000 were derived by Brownell from Bielinski business accounts. The remaining balance of $276,000 was paid from a Brownell account.

¶ 14.    Brownell had originally advised Attorney Gral that the Bielinskis were possible participants in the Belize transaction. In the spring of 2003 Brownell advised Attorney Gral that the Bielinskis would not be participating in this transaction. At that time Brownell and Attorney Gral decided to bring Georgetown into the deal. Brownell and Attorney Gral closed on the purchase of the Florida condominium on June 28, 2004. At some time prior to the closing Attorney Gral learned that the money provided by Brownell for the first two down payments came from Bielinski business entities. Attorney Gral asked Brownell whether the Bielinski entities had been repaid, and Brownell said they had been.

¶ 15.    Attorney Gral did not contact either Frank or Harry Bielinski and did not confirm that they were aware their funds had been used for this purpose or whether they had been repaid. In fact, the Bielinskis were not aware of and had not approved the use of their funds, nor had they been repaid by Brownell. Attorney Gral admits that his acts were inappropriate since he did not contact the Bielinskis. However, Attorney Gral said he did not know that Brownell had improperly

taken the $552,000 from the Bielinskis, and he said he had been assured by Brownell that the Bielinskis had been repaid.

¶ 16. Shortly after the closing of the Belize transaction, Brownell took $620,000, ostensibly to partially reimburse himself for his earlier down payments for Belize. Thus, besides not repaying $552,000 to Bielinski, Brownell took the $620,000 for his own use. Attorney Gral paid the $552,000 to the Bielinskis on January 18, 2006, through the clerk of court, from his personal account.

¶ 17. The stipulation states that in the Harrison Lakes and Belize transactions, in reliance on Brownell's representations and his legal and apparent authority to act, properties were transferred to Georgetown, an entity in which Attorney Gral had an interest. Attorney Gral admits that when he became aware of certain facts in the transactions relating to Bielinski, he failed to confirm the information with Frank or Harry Bielinski. Attorney Gral's actions had the effect of placing his own financial interests ahead of his clients' interests.

¶ 18. The stipulation states that Attorney Gral did not improperly take funds from the Bielinskis, did not intend to take funds from them, and did not know that funds had been improperly taken. The stipulation states that in both transactions Brownell was the one who improperly took the funds from the Bielinskis, and Brownell failed to advise Attorney Gral that the funds had been improperly taken.

¶ 19. In a sentencing memorandum filed by the government in the federal court action, the government said that, "Gral's wrongdoing generally involves 'sins of omission.' " The government also said that "Gral did not directly obtain money from the Bielinskis," and that "Brownell was the instigator of the overall fraud against

the Bielinskis," and that "many aspects of Brownell's fraud did not involve Gral."

¶ 20. The stipulation provides that during the pertinent timeframe, Attorney Gral was not aware that Brownell had a criminal record, and Attorney Gral says he learned of Brownell's criminal record during the government's criminal investigation. Attorney Gral says that through the years he observed that the Bielinskis, members of their management team, and people in the business community generally viewed Brownell as a respected business person. Attorney Gral says he had been advised and observed that Brownell had a history of strong performance with the Bielinski business. Attorney Gral says when he was introduced to the Bielinskis and Brownell in July of 2000 Brownell had been with the Bielinskis for almost five years in various management positions, and it appeared to Attorney Gral that the Bielinskis relied heavily on Brownell in the management of their businesses and that Brownell had the Bielinskis' trust and confidence. Attorney Gral says it appeared that the Bielinskis treated Brownell as an equal with respect to executive decision making and management of their businesses.

¶ 21. The stipulation states that it appeared to Attorney Gral that Brownell had a special relationship with the Bielinskis since they were partners with Brownell in other projects, and it appeared to Attorney Gral that it was not unusual for Brownell to have roles in addition to his management position with Bielinski.

¶ 22. Attorney Gral says he made no effort to conceal Georgetown from the Bielinskis, and besides the transaction relating to the development of a new office building for Bielinski, Attorney Gral believed the Bielinskis wanted to engage in other transactions with Georgetown, based on Attorney Gral's discussions with

the Bielinskis and also based on Brownell's statements to Attorney Gral. The Bielinskis had signed operating agreements with Georgetown for two other projects.

¶ 23. Prior to the federal court's imposition of sentence in the criminal matter, Attorney Gral entered into a resolution with Bielinski and MBF. As part of the resolution Attorney Gral agreed to pay $4,489,533. The resolution covered amounts claimed as criminal restitution as well as other claims that could possibly be made in a non-criminal context. Attorney Gral paid $1,200,000 to Bielinski on June 23, 2006. In order to make this payment Attorney Gral liquidated a large portion of his retirement account and received a loan from his father. For future payments and interest, Attorney Gral will liquidate his share of real estate holdings. This real estate is held in entities in which Attorney Gral does not hold the controlling interest and/or entities which are not liquid, necessitating Attorney Gral's voluntary efforts to attempt to obtain the cooperation of his co-owners. Many of the funds that Attorney Gral used for resolution could be utilized only because of his efforts, including his retirement account, certain marital assets, the funds from his father, and the liquidation of entity protected assets where his co-owners are not required to sell assets or purchase Attorney Gral's interest.

¶ 24. The stipulation provides that when the federal investigation began in the summer of 2004 the government was concerned that the assets held by the Georgetown entities, predominantly real estate ventures in various stages of completion, would be dissipated. On his own initiative, Attorney Gral, through his attorneys, retained Benjamin S. Stern, a real estate attorney, to serve as counsel for Georgetown. Attorney Stern retained Ogden & Company as Georgetown's

third-party manager. Although Attorney Gral is an owner of Georgetown, he relinquished legal control of Georgetown to Ogden. Ogden's role as manager of the Georgetown entities is to oversee the business affairs and properties of the Georgetown entities.

¶ 25. Attorney Gral's efforts in retaining Stern and Ogden as third-party counsel and advisor avoided the government's seizure of the Georgetown properties, preserved the value of those properties, and provided a vehicle to obtain independent management and analysis of Georgetown's finances. Because of the nature of Georgetown's ownership structure, an independent manager was necessary to run the business and to avoid deadlock situations between the two owners, Attorney Gral and Brownell. Throughout the process, Attorney Gral played and continues to play a key role for the third-party attorney and manager. Attorney Gral took the leading role in forming the third-party arrangement and paid most of the attorneys' fees and other costs associated with establishing Stern and Ogden as third-party attorney and manager. Attorney Gral continued to fund the capital needs of the Georgetown entities, and from September 2004 through June 15, 2006, he contributed over $850,000 to meet Georgetown's funding needs.

¶ 26. Attorney Gral paid Brownell's share of Georgetown's obligations when Brownell stopped meeting his obligations to Georgetown. Attorney Gral's financial support of Georgetown enabled Georgetown to fulfill its loan obligations and avoid losses by the lending institution. The stipulation states that Attorney Gral was always available to the third-party attorney and manager as a resource for information about the properties, and Attorney Gral responded to their inquiries expeditiously and cooperated fully with them.

Attorney Stern described Attorney Gral's actions as being "exemplary." As a result of Attorney Gral's work, the assets of the Georgetown entities have been and are being preserved in an independent and efficient manner.

¶ 27. The stipulation points out that various mitigating factors, as set forth by the American Bar Association Center for Professional Responsibility, are present in this case. Those mitigating factors include the fact that Attorney Gral did not convert any client funds to his own use, did not intend to convert any client funds to his own use, and did not know of any such conversion. In the Harrison Lakes transaction, Attorney Gral believed that Georgetown's purchase of Harrison Lakes from FHB would prevent a loss to FHB. In the Belize transaction, Attorney Gral did not know that Brownell had improperly taken funds from the Bielinskis and Attorney Gral had been assured by Brownell that the Bielinskis had been repaid.

¶ 28. Additional mitigating factors mentioned in the stipulation are that Attorney Gral's acts were primarily acts of omission in that he failed to confirm and/or disclose certain acts or representations of Brownell, who was Bielinski's CEO and Attorney Gral's principal client contact. Attorney Gral relied on Brownell's actual and apparent authority to act based in large part on Attorney Gral's observations of the relationship between Brownell and the Bielinskis. The stipulation notes that unlike Brownell, Attorney Gral converted no Bielinski funds to his own personal use, was not aware of any such conversion, and took steps to remedy the conversion of funds by Brownell.

¶ 29. The stipulation notes that Attorney Gral took significant steps to preserve Georgetown's assets during the government's investigation and he is con-

tinuing to preserve those assets. On his own initiative and largely at his own individual expense, Attorney Gral retained a third-party counsel and real estate advisors to provide a vehicle for the independent management and analysis of Georgetown's business activities. Attorney Gral entered into resolutions with third parties in which he agreed to pay a total of $4,489,533. A substantial portion of those funds would not have been able to be obtained by third parties since they involved Attorney Gral's retirement account, certain marital assets, funds from his father, and the liquidation of entity-protected assets.

¶ 30. The stipulation also notes that Attorney Gral cooperated with the government's prosecution of the criminal case, promptly admitted wrongdoing, and entered a guilty plea. Attorney Gral also cooperated with the OLR's prosecution of the disciplinary complaint. Attorney Gral has no prior criminal or disciplinary record. He received a severe sanction through the criminal justice system, suffered significant collateral consequences, and has expressed sincere remorse and responsibility for his wrongdoing.

¶ 31. The OLR and Attorney Gral stipulated that based on their stipulated findings of fact, the referee could enter conclusions of law stating that Attorney Gral's conduct violated SCR 20:8.4(b) in that he committed a criminal act that reflects adversely on his honesty, trustworthiness or fitness as a lawyer in other respects. The parties requested that the referee approve the stipulation and file a report finding facts and misconduct consistent with the stipulation and recommending that Attorney Gral's license to practice law be suspended for three years, effective February 27, 2006, which was the date of the summary suspension.

171

¶ 32. On August 6, 2006, the referee issued his findings of fact, conclusions of law and recommendation in which he adopted the parties' stipulated findings of fact; found that the OLR had proven by clear and convincing evidence that Attorney Gral violated SCR 20:8.4(b); and recommended that Attorney Gral's license to practice law be suspended for three years commencing February 27, 2006. No appeal was filed from the referee's report and recommendation.

¶ 33. This court will adopt a referee's findings of fact unless they are clearly erroneous. Conclusions of law are reviewed de novo. *See In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, ¶ 5, 269 Wis. 2d 43, 675 N.W.2d 747. The court may impose whatever sanction it sees fit regardless of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶ 34. We adopt the referee's findings of fact and conclusions of law and determine that a three-year suspension is the appropriate discipline for Attorney Gral's professional misconduct. The actions that led to his federal mail fraud conviction are serious failings that warrant a significant level of discipline. We further agree with the referee that the suspension should be retroactive to February 27, 2006, the date in which the court summarily suspended Attorney Gral's license. We also agree that Attorney Gral should pay the full costs of the proceeding.

¶ 35. IT IS ORDERED that the license of Michael A. Gral to practice law in Wisconsin is suspended for a period of three years, effective February 27, 2006.

¶ 36.  IT IS FURTHER ORDERED that Michael A. Gral comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended, if he has not already done so.

¶ 37.  IT IS FURTHER ORDERED that within 60 days of the date of this order Michael A. Gral pay to the Office of Lawyer Regulation the costs of this proceeding. If the costs are not paid within the time specified, and absent a showing to this court of his inability to pay the costs within that time, the license of Michael A. Gral to practice law in Wisconsin shall remain suspended until further order of this court.